HON. R. H. MARR,
HON. A. DeBLANC,
HON. W. B. EGAN,
HON. W. B. SPENCER,
} *Associate Justices.*

---

No. 6699.

THE STATE EX REL. J. J. DANIEL VS. RUFUS E. ROSE

This court, or any member of the court, is competent to issue the writ of *habeas corpus* in any case that *might* be brought here on appeal. It is not necessary the appeal should be pending.

The Governor's commutation of a sentence to imprisonment at hard labor, which remits the punishment imposed, and substitutes a much milder punishment, is not executory. and hence can not entitle the condemned party to release from custody, until the commutation has been consented to by the Senate.

APPEAL from the Second Judicial District Court, parish of Jefferson. Pardee, J.

*R. King Cutler*, for petitioner.

*John J. Finney*, for respondent.

The opinion of the court was delivered by

MARR, J. Daniel was convicted of murder, without capital punishment, in the Second Judicial District Court for the parish of Jefferson, and was sentenced to the penitentiary for life. On appeal the verdict

and judgment were set aside for illegality in the composition of the grand and petty juries; and the case was remanded for further proceedings. 28 An. 38. He was again indicted for the same offense, convicted without capital punishment, and sentenced to "imprisonment with hard labor for life in the State penitentiary;" and he once more sought relief by suspensive appeal.

Pending this appeal, on the sixth of January, 1877, the Governor, Kellogg, commuted this sentence by an instrument in writing, signed by himself, countersigned by the Secretary of State, and bearing the great seal of the State, the material part of which is as follows:

"To the Sheriff of the parish of Jefferson:

"Whereas, J. J. Daniel was tried and convicted, before the Second Judicial District Court, parish of Jefferson, of the crime of 'murder,' and sentenced to the penitentiary at hard labor for life;

"Whereas, for good and sufficient reasons I have seen fit to grant a commutation of said sentence to the said J. J. Daniel to three years imprisonment in the parish prison, from date of first commitment in December, 1873;

"Now, therefore, you will take notice of the said commutation and act accordingly, and for so doing this shall be your sufficient warrant and authority."

The term of imprisonment in the parish prison having expired in December, 1876, the prisoner was released by the sheriff and set at liberty; and on the second of April his counsel filed in the Supreme Court the following motion, in the case of the State vs. Daniel, which was entered on the minutes the same day:

"On motion of R. King Cutler, of counsel for defendant, and on suggesting that defendant, J. J. Daniel, was sentenced to hard labor in the State Penitentiary for life, and that thereafter W. P. Kellogg, then Governor of the State of Louisiana, commuted the punishment of said J. J. Daniel to imprisonment in the Parish Prison, and that said Daniel long ago served out his term of imprisonment in the parish, and that he, said Daniel, has been at liberty since about the first of January, 1877, it is ordered that the appeal herein taken by said J. J. Daniel be dismissed."

At the foot of this motion is the following:

"I consent to the appeal taken in the above-entitled cause being dismissed.

"(Signed)            H. N. OGDEN, Attorney General."

In June, the judge of the Second Judicial District Court, treating Daniel as a fugitive from justice, inasmuch as he had not satisfied the sentence pronounced, and had not been pardoned by the Governor with the consent of the Senate, nor reprieved; and the sentence had gone into

effect and had not been commuted in any legal sense or form, issued a writ for his arrest, and detention in prison until discharged in due course of law. Having been arrested under this writ, and being detained in actual custody under the sentence of the court, the prisoner applied to me for the writ of *habeas corpus*. The facts as stated appear of record, and by the petition and the return; and there is no controversy about them.

The representative of the State excepted that neither the Supreme Court, "nor any of the judges thereof, has any authority to issue the writ of *habeas corpus* herein, the court having no longer any appellate jurisdiction over the case of the State of Louisiana vs. J. J. Daniel."

This exception was withdrawn at the hearing; but as every judicial tribunal must either assume jurisdiction without question, or determine whether it has jurisdiction when it is questioned or questionable, I am not relieved of the necessity of inquiring whether I have authority to grant and to proceed upon this writ.

The constitution, article seventy-seven, declares that: " "The Supreme Court, and each of the judges thereof, shall have power to issue writs of *habeas corpus*, at the instance of persons in actual custody, when they may have appellate jurisdiction;" and article seventy-four confers upon the Supreme Court jurisdiction in criminal cases, on questions of law only, whenever the punishment of death, or imprisonment at hard labor, or a fine exceeding three hundred dollars, is actually imposed."

The court of which I am a member has not now jurisdiction in the case of the State vs. Daniel in which the appeal was dismissed in April last. The language of article seventy-seven does not require that the court should have jurisdiction by an appeal actually pending; the requisite is that the matter shall be such that the court *may* have appellate jurisdiction ultimately, in the event that the proceedings in the court of first instance reach a point at which an appeal would be admissible.

Since the sentence was pronounced in the case of the State vs. Daniel, an event has occurred which, as he claims, has relieved him of that sentence; that is, he relies upon the commutation, and the completion of the term in the parish prison as a perpetual bar to further proceedings against him. The only question is whether the commutation has this effect; and this is purely a question of law, and it arises in a criminal case in which the punishment is hard labor. If the Governor had the power thus to commute the sentence, the prisoner is not subject to detention; and he should be discharged. If the Governor had not this power, the prisoner should not have been released from prison; and he must be remanded into custody to be dealt with according to law.

The case now presented, is, therefore, a new one, in which none of the issues involved in the original proceeding in the district court, and brought up to the Supreme Court for review on the appeal, can arise.

Perhaps the better practice would have been to have applied to the judge of the district court for the writ of *habeas corpus;* and to have exhibited the commutation in support of the application. If the judge had decided that this did not entitle the prisoner to be discharged, he might have appealed to the Supreme Court. I am not prepared to say, and I shall not so decide now, that it was not equally at the option of the prisoner to make his application to one of the judges of the Supreme Court, as he has done. The question to be solved by me is precisely that which would have been submitted to the Supreme Court, on appeal, if the proceeding had been taken in the district court in the first instance; and the case seems, therefore, to come within the letter of article seventy-seven of the constitution. *In favorem libertatis,* I should be inclined to grant the writ in every case where there was not manifest want of authority; and I proceed, therefore, to consider the merits.

The constitution, article fifty-eight, declares that: " The Governor shall have power to grant reprieves for all offenses against the State, and, except in cases of impeachment, *shall*, WITH THE CONSENT OF THE' SENATE, *have power to grant pardons,* (and) remit fines and forfeitures, after conviction. In cases of treason he may grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested. *In cases when the punishment is not hard labor, the party, upon being reprieved by the Governor, shall be released, if in actual custody, until final action by the Senate."*

This article, except the last clause, italicized, which is new, is copied from antecedent constitutions: 1864, article fifty-two; 1852, article forty-four; 1845, article forty-seven. Section eleven of article three of the constitution of 1812 differs in that it seems not to have made the power to remit fines and forfeitures dependent upon the consent of the Senate; that it uses the words "*approbation* of the Senate," instead of "*consent* of the Senate;" and that it omits the words, "after conviction."

This recurrence to the several successive constitutions of the State shows that the people of Louisiana have never seen fit to confer upon the Governor absolute power to grant pardons. From the organization of the government, under the first constitution, uniformly, this delicate and most important power has been subject to and dependent upon the consent of the Senate. The power to grant reprieves is absolute and unlimited, except in cases of treason; but under the existing constitution, as under those which preceded it, the Governor can not otherwise extend clemency to convicts without the consent of the Senate.

I have searched in vain for any express grant of power to the Governor to commute the punishment prescribed by law, or to interfere with the sentences pronounced by the judicial tribunals otherwise than by reprieve, or, with the consent of the Senate, by pardon. The reprieve is

State ex rel. Daniel vs. Rose.

merely a respite, a postponement of the execution of the sentence of the law, as pronounced by the judge; and it is usually granted in order that time and opportunity may be obtained for the final action of the Governor and the Senate on an application for pardon.

Manifestly, in this case, the Governor did not intend to grant a reprieve. The reprieve leaves the sentence in full force, except that the execution is temporarily suspended; whereas, in this case, the act of clemency purports to have set aside, abrogated the sentence, by substituting a new and wholly different punishment. The statutory alternative for death, where the verdict of " guilty " is qualified by the addition of the words, " without capital punishment," is hard labor for life in the penitentiary; and that alternative was the necessary legal consequence of the verdict in this case. The object of the Governor was to relieve the convict of this, the only statutory alternative and penalty; and to substitute imprisonment for three years in the parish prison. The detention of the accused in prison, from the time of his first commitment to the execution of the sentence, is merely for safe-keeping, and it is not in legal intendment, punishment for the offense. In this case the term of imprisonment in the parish prison had actually expired when the commutation was granted; so that the convict was discharged immediately and without punishment.

The Governor could not have understood that he was granting a pardon in the usual sense of the term; because he must have known that he had no power to do this without the consent of the Senate. Obviously he intended to intervene between the convict and the punishment prescribed by law; and, by commutation of the sentence, which it seems to have been assumed did not require the consent of the Senate, to afford all the relief and benefit of an absolute formal pardon without the delay and uncertainty of the final action and consent of the Senate.

In the case of Wells, convicted of murder and sentenced to death in the District of Columbia, the President granted him " a pardon of the offense of which he was convicted, upon condition that he be imprisoned during his natural life; that is, the sentence of death is hereby commuted to imprisonment for life in the penitentiary of Washington;" and on the same day Wells accepted the terms offered in these words: " I hereby accept the above and within pardon with condition annexed."

Some three years after, Wells applied to the judge of the Circuit Court of the District of Columbia for a writ of *habeas corpus*, upon the ground that the President had no power to attach the condition, and that the pardon was absolute. The Circuit Court held that the President had power to commute the punishment, and remanded the convict to the penitentiary. The case was taken to the Supreme Court of the United States; and it is reported in 18 Howard. Two of the judges

thought the court was without jurisdiction; another maintained that the President had no power to attach the condition; that the pardon was absolute; and that the prisoner should be discharged. The majority of the court decided that the power conferred upon the President by article two, section two of the constitution, " to grant reprieves and pardons for offenses against the United States, except in cases of impeachment," necessarily includes every form and species of pardon; that the commutation of the sentence was a conditional pardon, which, when accepted, became obligatory upon the convict; and that he was lawfully detained in the penitentiary. See also a discussion of the power of the President to grant pardon in Garland's case, 4 Wallace.

In some of the States—for example, Pennsylvania, Illinois, Texas—the Governor has power, by express constitutional grant, to commute sentences and punishment; but where there is no express law authorizing it, the commutation can be maintained only in virtue of the pardoning power, and as a modification, a condition of the pardon.

In Louisiana there is really no occasion for the exercise of this power. Certain crimes are punished with death. If in any such case the jury prefer, for any reason whatever, that the accused, although guilty of the crime as charged, should not suffer death, the addition of the words " without capital punishment" to the word "guilty" consigns the convict to hard labor in the penitentiary; and this is the only mitigation of the death penalty which the Legislature has chosen to allow; and it has intrusted this mitigation to the jury, whose solemn duty it is to consider, with all possible care, all the facts and circumstances and from them to determine the guilt or innocence of the accused. Pardon can be granted only after conviction. Conviction and sentence vindicate public justice and the offended majesty of the law; and if the executive and the Senate, calmly reviewing the facts and circumstances, conclude that the accused should not have been convicted and ought not to suffer the penalty, the organic law has wisely conferred upon them, not upon one or the other of them, the power to grant him a pardon; to open his prison door; and to relieve him of the disabilities and disfranchisement consequent upon conviction.

In certain crimes, characterized as detestable, comparatively of rare occurrence, the punishment is fixed and absolute, hard labor for life. In other cases there is a wide range in the duration of the punishment. There are no degrees of murder; but the accused may be convicted of a lower grade of crime, manslaughter, and be sentenced to hard labor for any term not exceeding twenty years.

In most cases the maximum and minimum of punishment are fixed; and the judge presiding at the trial will appreciate the facts, and graduate the punishment accordingly. Juries usually give all due weight to

State ex rel. Daniel vs. Rose.

every extenuating circumstance; and when they convict, in cases in which the penalty is not fixed and absolute, there is ample opportunity for the judge, in the exercise of his legal discretion, so to temper justice with mercy as to make any commutation, or interference with the sentence, short of an absolute pardon, not only unnecessary, but, in most cases, improper.

The organic law of Louisiana, like that of the other States, has separated the powers of the government into three distinct departments; and it is the peculiar province of the judiciary to ascertain the guilt of the accused, and to declare and impose the appropriate punishment; and interference by either of the other departments would, inevitably, tend to obstruct the proper administration of justice.    If a convict merits any punishment, that which the law prescribes and the sentence imposes should be inflicted; if he does not deserve to be punished, he should be pardoned.    The power to pardon is indispensable, because cases will occur in which this power alone can prevent wrong and injustice; but it will prove a curse to society instead of a blessing where it is not exercised with prudence, and in strict conformity to the grant.

If the power to commute the sentence of a judicial tribunal exists under the constitution of Louisiana, it is simply as a form of pardon, an incident to the power to grant pardons; and as the power of the Governor to grant pardon, in any case, is dependent upon the consent of the Senate, that form of pardon which consists in the commutation of the sentence, like every other pardon, whether absolute or qualified, equally requires the consent of the Senate.

I have gone thus at length into this discussion, because I have understood that the practice has prevailed to a considerable extent, of late years, of extending executive clemency to convicts by way of commutation, by the act of the Governor alone, without the consent of the Senate. There is no warrant for this in the organic law of Louisiana; and it can receive no countenance, it is entitled to no respect in the judicial tribunals.

The fact that the Attorney General consented to the dismissing of the appeal, on motion of the counsel of Daniel, is without significance.    The appeal could not have been dismissed without this consent; but the State was the appellee and was asking for nothing; and the dismissing of the appeal left the verdict and judgment appealed from in full force, except so far as the sentence might be affected by the commutation.

It is evident that the prisoner would not have dismissed his appeal, would not have abandoned his last hope of escape from imprisonment at hard labor for life in the penitentiary, if he had not relied confidently upon the commutation as an effectual and unquestionable bar to further proceedings against him.    I am inclined to think that the court would listen

favorably to an application to rescind the order dismissing the appeal,. and to reinstate the appeal; but that is a matter which I can not entertain, and about which I can not undertake to say what might be the action of the court.

It was suggested in argument that I might, in the event of my refusal to discharge the prisoner, make some order by which the execution of the sentence would be suspended until he could have an opportunity to move the court, at its meeting in November, to reinstate his appeal; but this would be simply a respite, a reprieve, which I have not the power to grant. The extent of my authority, under this proceeding, is to inquire whether the prisoner is lawfully deprived of his liberty; to discharge him if he is unlawfully held in custody, or to remand him into custody, if his imprisonment is lawful. The power to grant a reprieve in such a case belongs absolutely and exclusively to the Governor; and I think this is a proper case for an application to the Governor for a reprieve, in order that the prisoner may have the benefit of his appeal, which was suspensive, and which was evidently dismissed under a misapprehension and in error, in the event that the court should see fit to reinstate it on his motion. I am not to be understood as offering any advice, or making any suggestion to the Governor, as to what his action should be in the event of such an application to him by the prisoner.

It only remains for me to say that the commutation relied upon by the prisoner is a mere nullity; that the dismissing of the appeal removed the only obstacle to the execution of the sentence under which he is held in custody; and that his detention is lawful.

The writ is therefore dismissed; and the prisoner is remanded into custody, to be dealt with according to law.